# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

IN RE: SAGECREST II LLC and
SAGECREST HOLDING LIMITED

No. 3:16-cv-00021 (VAB)

## RULING ON APPEAL OF BANKRUPTCY COURT'S ORDER

Appellant, Equal Overseas Consulting ("Equal"), LTD, appeals from an order of the United States Bankruptcy Court for the District of Connecticut ("Bankruptcy Court") sustaining Appellees' objection to Equal's Proof of Claim. Notice of Appeal, ECF No. 1. The Bankruptcy Court concluded that the settlement agreement, on which the claim was based, was collusive and lacked consideration. Mem. of Decision on Debtor's Obj. to Claim of Equal Overseas Consulting, Ltd. ("Bankr. Op.") at 16-17, ECF No. 1-1.

The Bankruptcy Court therefore held that the agreement could not be enforced, and it sustained SageCrest's objection and held that "the monies claimed by Equal will be available for distribution in accordance" with the plan. Bankr. Op. at 18. Additionally, the Bankruptcy Court rejected a claim for a commission upon sale of property, holding that Equal was "attempting to circumvent one of the safeguards of court-approval of a debtor-in-possession's retention of professionals." Bankr. Op. at 17-18.

On appeal, Equal argues that the Bankruptcy Court wrongly applied U.S. law, instead of Canadian law, erroneously concluded that the agreement lacked consideration and was collusive, and erroneously denied payment of the commission. The Court disagrees, and **AFFIRMS** the Bankruptcy Court's Order.

1

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

The claims here stem from a larger bankruptcy proceeding related to a series of hedge funds and subsidiaries.[1] This case, however, arises primarily out of a real estate deal involving a hotel and property located in Toronto, Canada.

A.  **Factual Background**

SageCrest Dixon, Inc. ("Dixon") was a Delaware corporation and wholly-owned subsidiary of SageCrest Canada Holdings, Inc., a wholly-owned subsidiary of SageCrest II, LLC ("SageCrest"). Bankr. Op. at 2. Dixon's sole asset was property located in Toronto, Canada, where the Constellation Hotel was located. Bomhof Dep. at 89, Joint Ex. 1, *In Re Sagecrest, II, LLC*, 08-50754 (Bankr. D. Conn. 2014).

Dixon acquired the property in a Canadian bankruptcy proceeding. Bankr. Op. at 2. The property had been owned by two Canadian companies — 158930 Ontario, Inc., and its subsidiary, 2031939 Ontario Inc. — which had received approximately CDN $2 million[2] in financing from Jean-Daniel Cohen ("Mr. Cohen"), an investor, as well as an additional CDN $20 million in loans Cohen helped arrange. Transcript of Trial at 60, *In Re Sagecrest, II, LLC*, 08-50754 (D. Conn. Bankr. July 15, 2014). The two companies filed for bankruptcy under Canadian law in 2005, leaving Cohen the largest unsecured creditor. Additionally, after the start of proceedings, a SageCrest subsidiary acquired the first and second mortgages on the property and therefore become the largest secured creditor. Bankr. Op. at 3.

---

[1] The claims here stem from a larger bankruptcy proceeding addressed elsewhere. *See, e.g. In re SageCrest II, LLC*, 414 B.R. 9 (Bankr. D. Conn. 2009); *In re SageCrest II, LLC,* 3:10-cv-978 (SRU), 2011 WL 134893 (D. Conn. 2011). This decision only provides background as necessary for the claim at issue in this case.
[2] The currency figures are stated in Canadian dollars.

A court-appointed monitor then oversaw a bidding process for the property in 2006. *See generally* Endorsement, Appellee's Resp. Br., Ex. J., ECF No. 17-10. Two former principals of the property, Al Soorty and Zoran Cocov ("Soorty and Cocov"), made the first bid, but the Superior Court of Justice, Province of Ontarior, Canada ("Ontario Court") disapproved of the offer because it believed that Soorty and Cocov had not provided adequate assurances of financing. Endorsement ¶ 5, Appellee's Resp. Br., Ex. J.; Bankr. Op. at 3. Several other bids followed in September of 2006: Soorty and Cocov amended their offer, and Cohen submitted a bid on behalf of various entities he controlled and labeled "Equal Group." Cohen agreed to make financing available to Soorty and Cocov, if the offer was approved, with the understanding that Cohen could pursue his own offer should the Ontario Court reject that proposal. Jewitt Aff. ¶¶ 3, 8-9, Appellee's Resp. Br., Ex. BB, ECF No. 17-28; Bankr. Op. at 4. Soorty and Cocov and Cohen informed the Ontario Court of the agreement and sought another opportunity to submit an amended offer; the Ontario Court agreed "with some reluctance" and opened up bidding for "any party to put in a further offer" on the property. Endorsement ¶¶ 13, 19, Appellee's Resp. Br., Ex. J.

On October 16, an agent of SageCrest contacted Mr. Cohen to suggest that Cohen and the entities he controlled, labeled as the "Equal Group," join SageCrest in supporting a bid for the property. This conversation ultimately resulted in a "Settlement Agreement" between the two parties. *See* Settlement Agreement, Appellee's Resp. Br., Ex. O, ECF No. 17-15. The agreement noted that SageCrest had "proposed to fund a plan" that would allow it to "acquire all of the property and assets" related to the property. *Id.* § C. Cohen and Equal Group agreed that it would withdraw funding from Soorty and Cocov's bid, and that "it does not intend to participate in or support any alternative transaction to the Proposed Transaction," *i.e.*, a "Competing Bid." *Id.* ¶¶

3

1-2. In return, it would be paid a "fixed retainer" in two installments: CDN $ 1.369 million when Dixon became the owner of the property, and an additional CDN $1.379 million one year later. *Id.* ¶¶ 3(a)-(b). Additionally, "in the event that Dixon disposes of its interest in the Property, the Equal Group shall receive a commission from such sale proceeds in the amount of CDN$850,000." *Id.* ¶ 3(c).

The agreement contemplated that the parties would enter into a further consulting agreement that would govern the payment of these fees. *Id.* ¶ 3. The Settlement Agreement noted, however, that "[u]ntil such formal consulting agreement is executed, the terms hereof shall govern and the amounts set out above shall be payable regardless of the quantum of the services actually requested" by Dixon. *Id.*

The agreement also included a choice of law provision that stated it "shall be governed by the laws of Ontario and the federal laws of Canada applicable therein." *Id.* ¶ 8. Finally, there was a non-disclosure provision under which the parties "agree that the terms of this Agreement are confidential and shall not be disclosed to any third party" without written consent. *Id.* ¶ 7.

The parties to the Settlement Agreement did not inform the Ontario Court of the agreement. Bankr. Op. at 7. Instead, Soorty and Cocov and Dixon submitted offers to the monitor one day after the Settlement Agreement was signed. Cohen informed the monitor at that time that he had withdrawn his support for the Soorty and Cocov offer, and declined to make his own offer. The monitor approved the Dixon bid, and SageCrest took ownership of the property, eventually demolishing the Constellation Hotel in order to build a new one. By 2008, however,

4

Dixon and SageCrest were both bankrupt and they commenced bankruptcy actions in the District of Connecticut.[3]

### B. Procedural History

Both SageCrest and Dixon filed for bankruptcy in the District of Connecticut in 2008, and their cases were jointly administered. *See* Bankr. Op. at 8. The property was sold at a court-approved auction, and Dixon's case was fully administered and a final decree approved. *See* Bankr. Op. at 9.

On September 23, 2008, however, Equal filed a proof of claim, the subject of this appeal. *Id.* While the initial CDN $1.369 million payment had already been made, Equal claimed they should be paid the second installment of CDN $1.379 million, as well as the CDN $850,000 for the consulting fee. *Id.* SageCrest objected to the claim, arguing that it was, in effect, a "bribe" by past management of SageCrest to "induce Cohen to withdraw his support" for the competing bid and therefore "had such an arrangement been made in a U.S. Bankruptcy Court, it would be a crime." *Id.* at 9-10.

The Bankruptcy Court then held a two-day trial, after which it sustained SageCrest's objections. It declined to decide conclusively whether Canadian or U.S. law applied, instead holding that "the same result follows from the application of either." Bankr. Op. at 11. Under both Canadian and U.S. law, the court held, the Settlement Agreement lacked consideration and therefore was unenforceable. *Id.* at 16. Additionally, the agreement was collusive, "a side-deal between [SageCrest] and Cohen under which, for a pay-off, Cohen agreed to cease competing with [SageCrest] for the Property." *Id.* at 15. The Court reasoned that this was antithetical to both

---

[3] As noted in the Bankruptcy Court's opinion, SageCrest was a specialty lending hedge fund and one of twenty-seven related entities. Eight of those entities filed for bankruptcy in the District of Connecticut, including SageCrest and Dixon.

5

Canadian and U.S. bankruptcy law and, applying the doctrine of *in pari delicto*, the agreement was unenforceable. *Id.* at 15. Finally, the court held that there was no basis under U.S. law to allow for the payment of the CDN $850,000 commission. *Id.* at 17.

Equal timely filed a notice of appeal of the Bankruptcy Court's decision on January 5, 2017. The parties filed their designations of the record from the Bankruptcy Court, as well as briefing.

## II.   STANDARD OF REVIEW

A district court has jurisdiction to review final judgments, orders and decrees made by the Bankruptcy Courts. 28 U.S.C. § 158(a)(1). On appeal, the court reviews a Bankruptcy Court's legal conclusions *de novo*, including its determination of the applicable legal standards. *In re Refco Inc.*, 505 F.3d 109, 116 (2d Cir. 2007); *Rogers v. E. Sav. Bank (In re Rogers)*, 489 B.R. 327, 330 (D. Conn. 2013). Factual findings are reviewed for clear error. *Rogers*, 489 B.R. at 330.

"Under a *de novo* review, the appellate court affords no deference to the Bankruptcy Court's decision and decides the question as if no decision had been previously rendered." *St. Clair v. Cadles of Grassy Meadows II, L.L.C.*, 550 B.R. 655, 665 (E.D.N.Y. 2016) (*citing In re Reilly*, 245 B.R. 768, 772 (2d Cir. BAP 2000).

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013); *see also In re Manville Forest Prod. Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990) (same). The clearly erroneous standard "precludes this Court from reversing the Bankruptcy Court's decision if its account of the evidence is plausible, even if this Court is convinced that it would

have weighed the evidence differently." *In re Barretta*, No. 3:16-cv-1781(AWT), 2017 WL 3725610, at *1 (D. Conn. Aug. 29, 2017) (quoting *In re B. Cohen & Sons Caterers, Inc.*, 108 B.R. 482, 484 (E.D. Pa. 1989)).

## III. DISCUSSION

Equal raises several challenges to the Bankruptcy Court's decision. First, it argues that the Bankruptcy Court wrongly applied United States law, and failed to give appropriate weight to the choice-of-law provision in the Settlement Agreement. That provision applied Canadian law. Second, it argues that the Bankruptcy Court failed to recognize the consideration at issue in the Settlement Agreement. It argues that there was sufficient consideration to sustain the agreement under either Canadian or United States law, although it seeks the application of Canadian law. Third, Equal argues that the Court wrongly held that the agreement was collusive. Equal contends that the Settlement Agreement resulted in a benefit to the creditors, and therefore should not be deemed contrary to public policy. Finally, Equal argues that the consultancy fee should have been allowed because it argues the Consultancy Agreement was an executory contract which would "ride-through" bankruptcy unaffected. The Court disagrees.

As addressed in greater deal below, the Court affirms the finding that the agreement was collusive, and therefore unenforceable for public policy reasons. The Court also finds that, as a result, U.S. law controlled. Given these findings, the Court will not reach the question of whether there is adequate consideration to support the Settlement Agreement; it affirms the Bankruptcy Court's decision on *in pari delicto* grounds. Finally, for similar reasons, it affirms the Bankruptcy Court's denial of the consultancy fee.

7

### A. Choice of Law

The Court must first decide which law applies, U.S. law or Canadian law. The Bankruptcy Court did not conclusively decide whether to apply U.S. law or Canadian law. Bankr. Op. at 11-12. Instead, the Bankruptcy Court held that "the Court need not dwell on which law applies because the same result follows with the application of either." *Id.* at 11. The Court noted, however, that "[a]ssuming there is a conflict, the choice of law rule which would govern is federal common law since jurisdiction in this case is based on federal law, *i.e.*, the Bankruptcy Code." *Id.* at 11 n. 24.

Equal points to the Settlement Agreement's choice-of-law provision, which applies Canadian law to the agreement. *See* Appellant's Br. at 21-25; *see also* Settlement Agreement ¶ 8, Appellee's Resp. Br., Ex. O. ("This Agreement shall be governed by the laws of Ontario and the federal laws of Canada applicable therein."). It argues that "Supreme Court precedent holds that, when considering choice of law provisions involving international contracts, there is a strong presumption that such provisions are to be enforced." Appellant's Br. at 22 (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)). It also argues that the Bankruptcy Court erroneously concluded that there was a stronger basis for applying American bankruptcy law rather than Canadian law, and that Canadian law should control given that it was selected by the parties and the matter arises from Canadian insolvency proceeds involving Canadian property. *Id.* at 23-24.

SageCrest argues that the Bankruptcy Court properly concluded that U.S. law would apply in the event of a conflict. Appellees' Resp. Br. at 28. They argue that the Court "held that it would apply U.S. law . . . but that the choice was essentially immaterial . . . because the same result obtains under either Canadian or U.S law." *Id.* at 29. They too turn to support their

position with the Supreme Court's decision in *M/S Bremen* and the Second Circuit's decision in *Roby*, highlighting that, while foreign choice-of-law provisions are presumptively enforceable, "a choice of law provision will be disregarded when its use would contravene the strong public policy of the forum court." *Id.* at 31.

In *Roby*, the Second Circuit addressed forum selection and choice of law provisions in contracts related to the sale of securities. *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1357 (2d Cir. 1993). Appellants in that case sought to litigate their claims in federal court, instead of arbitrating in London, because they argued that London would not be an effective forum and requiring the claims to be heard there would contravene U.S. public policy, as embodied in the Securities Act of 1933. *Id.* at 1358. The Second Circuit reviewed four factors relevant in deciding whether a choice of law provision is unreasonable, and therefore invalid: "(1) if their incorporation into the agreement was the result of fraud or overreaching . . . (2) if the complaining party 'will for all practical purposes be deprived of his day in court,' due to the grave inconvenience or unfairness of the selected forum . . . (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy . . . or (4) if the clauses contravene a strong public policy of the forum state. . . ." *Id.* at 1363 (quoting *Bremen*, 407 U.S. at 15, 18 and citing *Carnival Cruise Lines v. Shute*, 499 U.S. 585 (1991)).

The clause here satisfies the first three factors. U.S. Bankruptcy law has a strong public policy against enforcing collusive or price-fixed bids in real estate contracts. This public policy is clear given the Bankruptcy Code's provision allowing for a trustee to "avoid a sale . . . if the sale price was controlled by an agreement among potential bidders at such sale." 11 U.S.C. § 383(n).

The Bankruptcy Court held that the settlement agreement at issue should not be enforced, in part, because it was collusive. There are competing choice-of-law issues at play therefore that will affect the Court's adjudication on the merits. If this Court agrees with the Bankruptcy Court and affirms its decision that the agreement is void for public policy reasons, then it also follows that those same policy interests would invalidate the choice-of-law provision. If it is not void, then there is no issue applying Canadian law in determining whether there has been adequate consideration, the other ground on which the Bankruptcy Court sustained the objection to Equal's claim.

B.   **Collusive Contracts and Bid-Rigging**

The Bankruptcy Court held that the payments could not be enforced under the doctrine of *in pari delicto*. Bankr. Op. at 16. The doctrine of *in pari delicto* "prohibits wrongdoers from evading responsibility for their own corrupt bargains by leaving the parties where it finds them." *In re Flanagan*, 415 B.R. 29, 36 (D. Conn. 2009) (applying Connecticut law). That is: the Court will not enforce those illegal or corrupt bargains. *Cf. Kaiser Steel Corp. v. Mullins et. al.*, 455 U.S. 72, 77 (1982).

The Bankruptcy Court determined that the "evidence supports a finding that the Settlement Agreement, with the subsequent consulting Agreement, was a side-deal between [SageCrest] and Cohen under which, for a pay-off, Cohen agreed to cease competing with [SageCrest] for the Property." Bankr. Op. at 15. The Court concluded that the agreement would not have been enforced at the time by the Canadian court, noting that the Canadian court had not been informed of the deal and that "it also would have found [the agreement] to be offensive to the integrity of the Canadian legal system and/or a manifest interference with the administration of justice." Bankr. Op. at 16.

Additionally, the Bankruptcy Court held that the parties' conduct was "antithetical to the Bankruptcy Code, and this Court will not countenance such conduct." Bankr. Op. at 17. The Court also suggests that had the original sale take place under U.S. federal court supervision, it would be barred by 11 U.S.C. § 383(n), which prohibits collusion or bid-fixing in court-supervised sales of property:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.

The prohibition only applies to agreements that seek to control, rather than merely affect, the price. *In re New York Trap Rock Corp.*, 42 F.3d 747, 753-54 (2d Cir. 1994) (holding party had pled a "viable theory" under § 383(n) where it alleged there was agreement bidder would drop out after selling its half to another party). As the Second Circuit noted, however, a payment to "induce" another bidder "to drop out of the bidding" is "close to the classic collusive bidding against which the statute is directed. *Id*. at 753.

Equal does not dispute that an agreement violating § 363(n) would be unenforceable. *See* Appellant's Br. at 31. Rather, Equal argues that "[t]he Bankruptcy court misapplied American law when it found that an agreement between two parties that results in a higher and better offer than either party had offered previously is collusive and unenforceable." Appellant's Rep. Br. at 16, ECF No. 24 (citing *In re GSC Inc.,* 453 B.R. 132 (Bankr. S.D.N.Y. 2011)). It argues that "[w]here, as here, the result of the Settlement Agreement is that the price goes up, not down, Section 363(n) is not violated." *See* Appellant's Op. Br. at 32. This argument is unpersuasive for several reasons.

First, Equal frames its argument as one concerning an erroneous conclusion of law: that the court failed to recognize that an agreement that might be otherwise deemed collusive and

11

unenforceable could be enforced, if it resulted in a higher offer. Appellant's Rep. Br. at 16. The Bankruptcy Court explicitly noted, however, that, under U.S. law, courts have enforced agreements where two parties agree to act together and raise their bid. Bankr. Op. at 17. The court distinguished that scenario from the factual setting here, noting that "here, one party agreed to not submit a bid in exchange for a payment, so that the other party could present its own bid, unchallenged." *Id.* It appears then that Equal challenges a factual finding — a finding which this Court will not review *de novo* but instead under a clearly-erroneous standard. *Cf. In re Sanner*, 218 B.R. 941, 947 (Bankr. D. Ariz. 1998) (treating collusive bidding allegation as question of fact and denying summary judgment on that basis).

Second, Equal relies almost exclusively on *In re GSC Inc.*, which held that "[a]n agreement between two bidders resulting in a single bid in exchange for consideration does not, without more, constitute collusion." 453 B.R. at 154. Unlike in *In re GSC Inc.*, however, the agreement between Equal and SageCrest did not result in a joint bid, but rather meant that Equal withdrew its support for the Soorty and Cocov bid and made no bid in its own right.

Indeed, the record shows that Cohen's Canadian lawyers informed him that the Settlement Agreement "may expose you to criminal and civil charges and/or claims for bid-rigging or conspiracy, at the instigation of Mssrs. Soorty and Cocov." Tayar Letter at 1, Appellee's Resp. Br., Ex. N. While the letter pertains to Canadian law, it provides support for the Bankruptcy Court's conclusion that the Settlement Agreement would also violate U.S. law.

Third, the bid price itself is not the only troubling part of this agreement. Equal argues that the bid following the Settlement Agreement resulted "in a three-fold increase in the funds made available for unsecured creditors from $1.75 million in SageCrest's original offer to $5.1 million." Appellant's Br. at 30-31. Appellees argue, however, that there is no evidence that this

12

$5.1 million bid was increased as a result of the agreement and cites to two other offers that might have been favored by the Canadian monitor had the parties not signed the agreement and Cohen withdrawn his bid or support. Appellee's Resp. Br. at 22.

Appellees also argue that "the Settlement Agreement more likely resulted not in an enhanced recovery to unsecured creditors, but in a better deal for Cohen at their expense." *Id.* at 22. They argue that the funds that "might otherwise have been available for distribution to all general unsecured creditors were diverted to Cohen who thereby received full payment on account of his claim leaving other creditors to receive partial payments." *Id.* at 23. This argument draws support from a finding of the Bankruptcy Court, which similarly noted that the "side-deal" included in the Settlement Agreement meant that "Cohen, an unsecured creditor, would receive more than his *pro rata* share of funds available for unsecured creditors." Bankr. Op. at 16.

As a result, the Court concludes the Bankruptcy Court's findings are not clearly erroneous. The record supports the conclusion that Cohen agreed not to submit a bid on the property and, in return was paid a sum of money. The record also supports that this payment could be seen as inducing another bidder "to drop out of the bidding" and, as the Second Circuit has noted, that makes it as "close to the classic collusive bidding" behavior prohibited by the Bankruptcy Code. *In re New York Trap Rock Corp.*, 42 F.3d at 753. And, even if a collusive bid would be appropriate and result in an increase in the bid price, the Bankruptcy Court's conclusion that no such increase occurred here is not clearly erroneous. The Court therefore affirms the decision of the Bankruptcy Court sustaining SageCrest's objection.

C.     **The Consulting Fee**

Equal also opposes the Bankruptcy Court's denial of its claim to the CDN $850,000 consultancy fee. The Bankruptcy Court found that Equal was "never retained as a professional

13

by [SageCrest] to assist it in selling the Property." Bankr. Op. at 17 (citing *In re Eureka Upholstering Co.*, 48 F.2d 95, 95 (2d Cir. 1931) and *In re Crafts Retail Holding Corp.*, 378 B.R. 44, 48-49 (Bankr. E.D.N.Y. 2008)). The Bankruptcy Court held that "[t]hrough its claim, Equal is, in essence, attempting to circumvent one of the safeguards of court-approval of a debtor-in possession's retention of professionals, i.e., control over administrative costs." *Id.* at 17-18. Because the property was sold through a court-administered sale, and Equal was neither retained as a professional under 11 U.S.C. § 327(a) nor provided services, the Bankruptcy Court denied payment of the consultancy fee. *Id.* at 18.

mnEqual claims that it is not a professional person. Appellants' Br. at 33. Because the "Consulting Agreement did not require Equal to perform any specific role in bankruptcy," it argues that it should not be considered a professional person. *Id.* at 34. Furthermore, it argues that the agreement "constituted an executory contract which was never rejected and 'rode-through' bankruptcy unaffected." *Id.* at 35.

In any event, the Court sees no reason why the Settlement Agreement would be unenforceable but the Consultancy Fee, included as part of that agreement, somehow would be enforceable. The Court therefore affirms the denial of the consultancy fee.

### D.    Consideration

Because it affirms the decision of the Bankruptcy Court on the grounds that the agreement was collusive and therefore unenforceable, the Court need not reach the question of whether there was adequate consideration to support the Settlement Agreement. *See, e.g.*, *In re Ampal-Am. Israel Corp.*, 554 B.R. 604, 617 (S.D.N.Y. 2016) ("A district court "may affirm [the bankruptcy court's decision] on any ground that finds support in the record, and need not limit its review to the bases relied upon in the decision[ ] below." (quoting *Freeman v. Journal Register*

*Co.*, 452 B.R. 367, 369 (Bankr. S.D.N.Y.2010)); *In re Sterling*, 565 B.R. 258, 269 (S.D.N.Y. 2017) (same).

### E. Abstention

Finally, Equal argues that it is "reversible error for the Bankruptcy Court to have initially refrained from abstaining after the Court itself called for briefing on the issue." Appellant's Br. at 24. SageCrest argues that the court properly declined to exercise its discretion, that Equal had waived the argument and that an appeal of the abstention decision was not properly before this Court. Appellant's Op. Br. at 40-41.

That decision does not appear to be before the Court. Equal sought appeal on "each and every aspect of the Memorandum Decision and Order sustaining the Objection to Claim of Equal Overseas Consulting, Ltd. entered on December 23, 2015." Notice of Appeal, ECF No. 1. That decision does not address abstention. Instead, the Bankruptcy Court addressed the abstention question in an earlier order. Equal could have filed an interlocutory appeal on that decision, but did not do so and the time to do so has passed. *See* Fed. R. Bankr. P. 8004 (setting procedures for appeal from an interlocutory order of the bankruptcy court); 28 U.S.C. § 158 (a)(3) (noting district court's jurisdiction to hear appeals from interlocutory orders and decrees "with leave of the court").

As a result, the abstention decision is outside the scope of the notice of appeal at this time. *See, e.g., In re Emanuel,* 450 B.R. 1, 6 (S.D.N.Y. 2011) ("The scope of the notice of appeal determines the subject matter jurisdiction of this Court. . . . While the Court is compelled to construe notices of appeal liberally, a notice that fails to mention a specific order does not confer subject matter jurisdiction as to that order on the reviewing court." (internal quotations and citations omitted)).

## IV. CONCLUSION

For the reasons stated above, the Bankruptcy Court's December 23, 2015, Order is **AFFIRMED**. The Clerk is directed to close this file.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of March, 2018.

/s/ Victor A. Bolden
Victor A. Bolden
United States District Judge